## In re MERTENS et al.

### (District Court, N. D. New York. August 13, 1904.)

1. BANKRUPTCY—ASSETS—SEMITONTINE INSURANCE POLICY.

A semitontine life insurance policy payable to a bankrupt or his assigns or legal representatives, which contains no provision for a cash surrender value, but, on the contrary, gives the insured no right except to a new paid-up policy without participation in profits in case of lapse, unless it remains in force at the end of the full tontine period, which time had not arrived when the adjudication was made, passes to the trustee as an asset of the estate, under Bankr. Act July 1, 1898, c. 541, § 70a, cl. 5, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]; but such policy is not one having a "cash surrender value," within the meaning of the proviso to said section which entitles the bankrupt to retain the same on making a payment to the trustee, although the company may offer to pay a sum for its surrender.

2. SAME—RIGHT OF TRUSTEE TO MATURE TONTINE INSURANCE POLICY.

A trustee in bankruptcy, acting by direction of the court, has the right to make the payments necessary to mature a tontine life insurance policy payable to the bankrupt or his assigns or legal representatives for the benefit of the estate, and will be required to do so where it is clearly in the interest of the creditors.

In Bankruptcy. On application for an order compelling the bankrupt to assign to the trustee certain policies of life insurance.

This is an application for an order compelling the bankrupt, Jacob M. Mertens, to assign, transfer, and set over unto Albert K. Hiscock, as trustee in bankruptcy of the estates of the firm of J. M. Mertens & Co., and of the individuals composing said firm, certain policies of life insurance. The matter was referred to C. L. Stone, Esq., of Syracuse, N. Y., as special master to take evidence and report the facts with his findings and opinion. The report is that the policies in question passed to the trustee; that they have no cash surrender value; and that the trustee is entitled to take and hold them as against the insured, J. M. Mertens, notwithstanding the fact that said bankrupt has tendered the trustee the alleged cash value of said policies—that is, the sum the insurance company was willing to pay for a surrender thereof.

Lewis & Crowley, for trustee.

Wilson, Cobb & Ryan, for J. M. Mertens.

RAY, District Judge. The petition in bankruptcy herein was filed against the firm of J. M. Mertens & Co. and the individuals composing such firm or copartnership on the 18th day of August, 1903, and Albert K. Hiscock was duly appointed receiver of the estate, etc., of the alleged bankrupts. Thereafter, and on the 15th day of September, 1903, said firm and said individuals, including said Jacob M. Mertens, were duly adjudicated bankrupts, and on the 14th day of

October, 1903, said Albert K. Hiscock was duly appointed trustee in bankruptcy of the estates of said bankrupts, both individually and as such copartners. Said trustee duly qualified. December 21, 1882, the Equitable Life Insurance Society of the United States issued its policy No. 252,314, assuring the life of Jacob M. Mertens. Prior to the institution of such bankruptcy proceedings this policy had become a simple life policy, payable to the wife of the assured, if living at his death; if not living, to his children, if any; and in default of child or children to the personal representatives of the assured. This policy concededly is so conditioned and incumbered, and the interest of the trustee therein, if any, is so remote and uncertain, that it is of no practical value to the estate, and it will not be further considered, and the bankrupt will be allowed to retain the same. March 8, 1884, said Equitable Life Assurance Society of the United States issued its policy No. 274,445, known as a "semitontine" policy, on the life of said Jacob M. Mertens. By this policy said assurance society, after the presentation of satisfactory proofs of the death of said Mertens, promised to pay to his executors, administrators, or assigns (less any indebtedness to the society on account thereof) the sum of $20,000. On its face this policy provides that after payment of premiums for not less than three complete years of assurance, if the policy shall thereafter become void in consequence of default in payment of subsequent premium, said society will issue, in lieu of such policy, a new paid-up policy, without participation in profits, in favor of said Jacob M. Mertens, his executors, administrators, or assigns, for the entire amount which the full reserve on said policy, according to the present legal standard of the state of New York, will then purchase as a single premium, calculated by the regular table for single premium policies now published and in use by the society; provided, however, that the policy shall be surrendered, duly receipted, within six months of the date of default in payment of premium. The policy further provides:

"This policy is issued and accepted upon the condition that the provisions and requirements printed or written by the society upon the back of this policy are accepted by the assured as part of this contract as fully as if they were recited at length over the signatures hereto affixed."

Under the provisions and requirements referred to in the policy are these:

"(1) That this policy is issued under the semitontine plan, the particulars of which are as follows:

"(2) That the tontine dividend period for this policy shall be completed on the eighth day of March in the year nineteen hundred and four.

"(3) That no dividend shall be allowed or paid upon this policy unless the person whose life is hereby assured shall survive the completion of its tontine dividend period as aforesaid, and unless this policy shall be then in force.

"(4) That all surplus or profits derived from such policies on the semitontine plan as shall not be in force at the date of the completion of their respective tontine dividend periods, shall be apportioned among such policies as shall complete their tontine dividend periods.

"(5) That upon the completion of the tontine dividend period on 8th March, 1904, provided this policy shall not have been terminated previously by lapse or death, the said Jacob M. Mertens shall have the option, either: First, to withdraw in cash this policy's entire share of the assets—i. e., the accumulated reserve, which shall be six thousand and forty-six $^{40}/_{100}$ dollars, and in ad-

dition thereto the surplus apportioned by this society to this policy; secondly, to convert the same into a paid-up policy for an equivalent amount, provided always that if the amount of said paid-up policy shall exceed the original amount of the assurance, a satisfactory certificate of good health from one of the society's medical examiners shall be required; thirdly, to withdraw in cash the share of the accumulated surplus apportioned by said society to this policy, and continue the policy in force on the ordinary plan; or fourthly, to continue the assurance for the original amount, and apply the entire tontine dividend to the purchase of an annuity, to reduce the subsequent premiums falling due upon this policy, provided, that in any year in which the amount derived from such annuity, together with the annual dividend on this policy, shall exceed the amount of premium due thereon, the excess shall be paid in cash to said Jacob M. Mertens or assigns.

"(6) After the completion of the tontine dividend period, while this policy shall remain in force, it shall be entitled to all the rights and privileges of ordinary policies of the same age and kind. * * *

"(11) The contract between the parties hereto is completely set forth in this policy and the application therefor, taken together, and none of its terms can be varied or modified, nor any forfeiture under it waived, except by an agreement in writing, signed by one of the following officers, viz.: * * *."

The application for this policy accords therewith, and assents to the provision limiting participation in the surplus to a time subsequent to the expiration of the tontine period in accordance therewith. The other policies in question, while not in all things identical, are so similar in their terms and provisions that it is unnecessary to recite them here. There is no variance that affects the legal proposition involved.

The bankrupt insists, first, that the policies are not transferable, and do not pass to the trustee in bankruptcy; and, second, that if they are, and would so pass, they have a surrender value, and that on payment thereof to the trustee he is entitled to retain same. He alleges that he has tendered the surrender value. The trustee insists that these policies have no cash surrender value within the meaning of the bankruptcy law, and that they constitute assets, and pass to the trustee. Evidence was given under the objection that the terms, etc., of the policies cannot be changed, enlarged, or varied to the effect that the Equitable Life Insurance Society of the United States had adopted a custom of paying a surrender value to the holders of such policies on the surrender of same in substantially the same manner as when a cash surrender value is provided for in the policy. In the policies in question not only is there a failure to provide for a cash surrender value, but the provisions are inconsistent with the existence of such a value. This, however, is not at war with the fact that the assurance association may be willing to pay money for the surrender of such policies. There is no pretense that this custom of the insurer formed a part of the contract between the parties, or that the insured could enforce the payment of a surrender value, or the payment of anything, on surrendering the policy. In short, the insurer might be willing to pay a surrender value and might not. Such payment would be optional with it. In the case of these policies the assurance association issuing them, at the date of the adjudication, was willing to pay a sum of money for their surrender. It was not obligated to do so. The agent of the association has stated the sums it is willing to pay. These sums the bankrupt has tendered the trustee.

Section 70 of the national bankruptcy law of July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451], provides:

"Sec. 70. Title to Property.—a The trustee of the estate of a bankrupt, upon his appointment and qualification, and his successor or successors, if he shall have one or more, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt, except in so far as it is to property which is exempt, to all (1) documents relating to his property; (2) interests in patents, patent rights, copyrights, and trade-marks; (3) powers which he might have exercised for his own benefit, but not those which he might have exercised for some other person; (4) property transferred by him in fraud of his creditors; (5) property which, prior to the filing of the petition, he could by any means have transferred, or which might have been levied upon and sold under judicial process against him: provided, that when any bankrupt shall have any insurance policy which has a cash surrender value payable to himself, his estate, or personal representatives, he may, within thirty days after the cash surrender value has been ascertained and stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated, and continue to hold, own, and carry such policy free from the claims of the creditors participating in the distribution of his estate under the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets. * * *"

While courts and judges of great learning have differed as to the proper construction of this section, it seems clear to this court that the policies in question here, containing as they do provisions beyond the ordinary life insurance policy, and in the nature of a contract for the investment of earnings under the policy, constitute assets, and have passed to the trustee, unless the bankrupt has prevented such effect by his action. This depends wholly on whether or not these policies have a "cash surrender value payable to the insured," J. M. Mertens, "his estate or personal representatives," within the intent and meaning of section 70, above quoted. In business circles and among life insurance men the words "cash surrender value" have a well-understood meaning, and no policy is understood to have a "cash surrender value" unless provided for in the policy so as to be enforceable by the insured. How can the holder of a policy say that it has a cash surrender value when such alleged value depends on the whim, caprice, or policy of the company issuing the insurance, and cannot be legally claimed or enforced by the holder of the instrument. The association might be willing to pay one day, entirely unwilling the next; willing to pay a considerable sum one day, only a nominal one the next. Is this the "cash surrender value" spoken of in the bankruptcy law? This court thinks not. It would seem that, had Congress intended that every bankrupt holding a policy of insurance of the nature of these should retain the same as his own on paying to the trustee in bankruptcy the value thereof that the insurer might fix by its custom or otherwise, it would have used language appropriate to that end, and not an expression implying a value the insured has a legal right to demand and the insurer may be compelled to pay—a value generally understood to be provided for in the policy itself. This view of the statute is sustained by two cases: In re Welling (C. C. A. 7th Circuit) 113 Fed. 189, 51 C. C. A. 151, and In re Slingluff, 106 Fed. 154, 5 Am. Bankr. R. 76. See, also, In re Steele, 98 Fed. 78, 3 Am. Bankr. R. 549; In re Diack,

100 Fed. 770, 3 Am. Bankr. R. 723; In re Grahs, 1 Am. Bankr. R. 465; In re Boardman, 4 Am. Bankr. R. 620, and Pulsifer v. Hussey, (Me.) 54 Atl. 1076, 9 Am. Bankr. R. 657. It would not be profitable to discuss these cases. In Re Welling, supra, all the judges in the Circuit Court of Appeals agreed as to the proper construction of the proviso in section 70 of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]. It is urged that the other construction ought to be given, for the reason that if policies not containing a provision for a cash surrender value may not be held by the bankrupt on his paying to the trustee the amount the company is willing to pay for the surrender thereof, an injustice will be done, as such bankrupt will not be able to take and hold the policy for his benefit in the future, while the bankrupt holding a policy containing such a clause will hold his. It is also urged that a trustee in bankruptcy has no power to pay premiums and preserve a policy in force or mature it for the benefit of the estate or creditors. The first contention may be true. In answer it is sufficient to say that each holder of a policy will stand on its terms, and derive his benefits therefrom. This court dissents in toto from the second contention.

Suppose a policy payable to the insured (a bankrupt) or his executors, administrators, or personal representatives lacks but one payment of premium to mature it and add thousands of dollars to the estate, is the trustee, acting under the direction of the court, powerless to make the payment and add so materially to the assets of the estate? The court would not permit a long delay in the settlement of a bankrupt's estate, or allow the trustee to speculate on the life of the insured, but it would permit the doing of those acts clearly in the interest of the creditors. Take, for instance, this very policy, No. 274,445. It appears from the evidence that at the date of the adjudication September 15, 1903, the company would have paid only $5,907 65 as an alleged surrender value had the policy then lapsed and been surrendered. September 8, 1903, the receiver paid the last premium necessary to mature the policy to the end of the 20-year or tontine period. By making that payment it became a certainty that if Mertens died before March 8, 1904, the policy would be worth $20,000. In case he did not die (and he did not), then the policy, at the end of the tontine period, or March 8, 1904, would be worth $11,318.40, and it is worth that. Hence the payment by the receiver of $293, and a holding on for about six months, has added to the value of that one policy $5,412.75, a sum that either goes to the estate for creditors or to the bankrupt. This court is decidedly of the opinion that the receiver had authority to make that payment and hold onto the policy, and that it was his duty so to do.

The motion is granted, but the order will be settled before me at Utica, N. Y., September 6, 1904.